THE STATE OF OHIO *v.* WALLACE. █

(No. 73056—Decided March 18, 1974.)

Findlay Municipal Court.

*Mr. Fred R. Kass* and *Mr. Robert A. Beutler, Jr.,* for plaintiff.
*Mr. William E. Clark,* for defendant.

WALKER, J. This matter came on the motion of the defendant to dismiss the complaint and for discharge of recognizance. The record shows that the state of Ohio filed a complaint in this court on December 7, 1973, alleging three counts of failure to plug wells located within the territorial jurisdiction of this court, all in contravention of R. C. 1509.12. A warrant was issued on January 8, 1974, and on the same day the defendant appeared, demanding counsel. Bond was set at $1,500, with ten percent to be in cash. Arraignment was set for January 16, 1974, at 9:30 a. m.

At the time of the arraignment, counsel appeared with the defendant and orally moved to dismiss the complaint.

A representative of the Attorney General of Ohio appeared on behalf of the state and asked to file briefs.

The court ordered that the defendant file his brief in support of his motion by February 15, 1974; the state to file an answer by March 1, 1974, and a reply, if necessary, by March 10, 1974. On February 14, 1974, the defendant filed his brief in support of his motion, and on March 5, 1974, after first checking with the court, the state requested leave to file their answer by March 15, 1974. That answer has not yet been filed with this court and no extension has been asked or given. The court is therefore ruling on defendant's motion and brief alone.

Even a cursory review of this chapter of the Revised Code makes it exceedingly clear that it is a highly technical chapter, written and passed by the Legislature at a time when environment was on everyone's lips. Obviously too, the chapter was written by technicians for technicians. At the same time, criminal sanctions are imposed for failure to abide orders or mandates from an administrative official. Granted, appeals may be taken from such order (Section 1509.36) to a board of review and from the board of review (created in Section 1509.35) to the Common Pleas Court of Franklin County, Ohio (Section 1509.37).

There is also created a Technical Advisory Council (Section 1509.38), but this council seems to be able to act only upon the request of the Chief of the Division of Oil and Gas except that they shall meet at least once each quarter. But what do they do? What advice are they to give? Nothing is said.

The key section is 1509.12. Defendant's counsel makes a great deal of the definition of "owner" [Section 1509.01(K)]. Doubtless, this has a meaning to persons skilled in the oil and gas industry. The burden is on the state to show that the defendant is the owner within the context of the statute, and while defendant urges that such definition is vague, ambiguous and indefinite in its meaning, the court is not overly concerned with this definition as of this time. But the court is concerned over any delegation of powers to any administrative officer, without the

slightest guidelines, to permit him to decide that a well should be plugged. The section (1509.12), in paragraph two, provides that "any well which is or becomes incapable of producing oil and gas in commercial quantities shall be plugged." What are "commercial quantities"?

A certain oil company makes much in its advertising of late of strippers (*i. e.*, men who strip wells of their remaining oil and gas after pumping has ceased) and the high cost of oil per barrel produced by strippers. And they say in such radio advertising that when gasoline fuel sold at thirty-cents per gallon they could not afford oil purchased from oil well strippers, but that they can afford such oil now that gasoline is fifty-cents per gallon at the commercial pump. Did Samuel Kerr, when he took oil from cracks in the earth's surface at the confluence of the Bull Creek and Allegheny River in Tarentum, Pennsylvania, which he bottled and sold as a nostrum, consider oil at thirty-cents a bottle, or fifty-cents a bottle, or did he consider it only as "commercial quantities"? Does production in "commercial quantities" have a guide applicable to all owners?

The Code (Chapter 1509) is silent. The law is not. The fourth branch of government, as political science writers often refer to administration agencies, are not legislators. They must have guidelines. This section of the Revised Code (1509.12) clearly gives the Chief of the Oil and Gas Division unlimited powers which he has, by this complaint, exercised without guidelines. He has, by an unwarranted and unconstitutional delegation of powers from the Legislature, exercised authority that was not his to accept nor the Legislature to give.

The court approved *Matz* v. *Curtis Cartage*, 132 Ohio St. 271. No administrative board or body may be delegated so much discretion without guidelines and no guidelines appear here. See, also, *Panama Refining Co.* v. *Ryan*, 293 U. S. 388, 79 L. Ed. 446, 55 S. Ct. 241; *State* v. *Switzer*, 22 Ohio St. 47, and others in this vein.

Accordingly, the court finds that R. C. 1509.12 is an illegal delegation of legislative authority to the Chief of the Division of Oil and Gas in that he is vested with un-

limited authority at his discretion without the requisite guidelines, yardstick or other measuring device, and it is, therefore, unconstitutional and void.

The defendant is ordered discharged and the recognizance is discharged.

*Defendant discharged.*

ON MOTION for reconsideration.

(Decided April 4, 1974.)

This matter came on the motion of the Attorney General of Ohio for the court to reconsider its decision heretofore rendered on the motion of the defendant to dismiss. It is not necessary here to recount the record, only to add the developments in the case since the court's decision on Defendant's motion was journalized on March 18, 1974. On April 1, 1974, the Attorney General filed the motion to which the court is presently addressing itself. Counsel for the defendant has orally waived his right to file a memorandum contra. Accordingly, the court is considering only the motion to reconsider at this time.

It is conceded that the statute in question is a highly technical one and, at first blush, it appears that ecological considerations play an important role. But, the statute in question (R. C. 1509.12) is also a criminal statute in that following a finding by the chief that a well should be plugged, and notice in writing to that effect given to the owner, "No owner shall fail or refuse to plug a well within the time specified in the order. Each day on which such a well remains unplugged thereafter constitutes a separate offense." R. C. 1509.99, provides that "whoever violates [Section 1509.12] * * * or any rules, regulations, or orders issued pursuant to these sections, shall be fined not less than one hundred nor more than five hundred dollars for a first offense; * * *."

The specific offense with which the defendant is charged is that "investigation by representatives of the Division of Oil and Gas revealed that there has been no effort made to produce these wells [in part located within the territorial

jurisdiction of this court] in a diligent and workmanlike manner in the past two years." (Adjudication Order No. 178, dated July 20, 1972, signed by G. Lyman Dawe, Division of Oil and Gas.)

Following this *ex parte* action, which in itself demonstrates a unilateral action, the defendant was ordered to plug such wells by the chief.

The court, incidentally, is not concerned with the definition of owner, though the Attorney General makes much of this question in his memorandum attached to his motion. The court is only concerned with the portion of the statute dealing with a finding by the chief that a well "is or becomes incapable of producing oil or gas in commercial quantities shall be plugged."

The state makes much of the fact that the Constitution of Ohio (Section 36, Article II) gives the Legislature the power to pass laws regulating mining, weighing, measuring and marketing coal, oil, gas and all other minerals. The court rejects those arguments even in the face of such a broad brush. No Constitution grants any legislature the right to delegate its uniquely legislative rights to regulatory agencies as has been done here.

It may very well be difficult to establish norms or guidelines applicable to each of the 25,000 individual wells in Ohio, but this court feels that it can be done and will, hereinafter, suggest a method. This court does not deny the right of the Chief of the Division of Oil and Gas to order a well to be plugged and in the manner such plugging shall be accomplished. But again, to permit the Chief of the Division of Oil and Gas to order a well to be plugged, which is or becomes incapable of producing oil and gas in commercial quantities, is an unwarranted and unconstitutional delegation of legislative authority, absent a clear and definable guideline for such a determination.

We need not concern ourselves with any facts or other information in order for this court to rule on the defendant's motion. The motion was directed at the unconstitutional delegation of legislative authority by the Legislature to an administrative, regulatory agency. The Attorney General makes much of the fact that this court ruled

on such motion without a hearing! Yet, there was no adversary hearing prior to the issuance by the Chief of the Division of Oil and Gas on Adjudication Order No. 178. When the chief makes a finding that a well is not producing in commercial quantities there is no adversary hearing to produce that finding. And, as the Attorney General points out, oil and gas technology is changing day by day. This court is impressed only with the fact that the Legislature has unconstitutionally clothed the Chief of the Division of Oil and Gas with what could be capricious, with what could be reckless, with what could be personal, with what could be dictatorial, power to make such a finding, and they have, by such action made him the Legislature. And this was, is, and will continue to be, unconstitutional.

Mr. Justice Holmes, in the First Lowell Lecture on the Common Law, said: "The life of the law has not been logic: it has been experience. The felt necessities of the time, the prevalent moral and political theories, intuitions of public policy, avowed or unconscious, even the prejudices which judges share with the fellowmen, have had a good deal more to do than the syllogism in determining the rules by which men should be governed. The law embodies the story of a nation's development through many centuries, and it cannot be dealt with as if it contained only the axioms and corollaries of a book of mathematics. In order to know what it is, we must know what it has been, and what it tends to become. We must alternately consult history and existing theories of legislation. But the most difficult labor will be to understand the combination of the two into new products at every stage. The substance of the law at any given time pretty nearly corresponds, so far as it goes, with what is then understood to be convenient; but its form and machinery, and the degree to which it is able to work out desired results, depend very much upon its past."

Many of my colleagues have suggested that it is not the province of courts of original jurisdiction to declare the laws of this state unconstitutional. This premise must be abused forthwith. If it is true that the life of the law is

experience, then we on benches at this level must begin to apply that experience.

The experience of the courts (indeed the logic of the courts) has been severely jolted of late by pronouncements of the Supreme Court not only of this state but of the United States. No longer is the criminal to be hailed before our benches to be convicted, as it were, out of his own mouth. And, if the person accused of a crime is to be convicted, the facts to support such conviction can't be capricious or, as in this case, *ex parte*. To permit legislation of this sort is unconscionable under our present experience of criminal law.

No legislature should permit such a delegation of its authority.

What is the solution? It is readily determinable. It is possible for the Legislature to clothe the Chief of the Division of Oil and Gas with the power to order a well to be plugged. But, when they give him, alone, unbridled authority to determine if any one well is producing in commercial quantities, that is an unconstitutional delegation of legislative authority because there are no guidelines.

Can there be guidelines capable of such determination with respect to 25,000 wells in this State, The Attorney General says, "No." This court suggests then, that prior to ordering a well to be plugged for any reason, an adversary hearing be held to make such a determination of production. Thereafter, given proper safeguards and appeals procedure, an order to plug would be appropriate and enforceable.

This is a criminal statute. A crime has allegedly been committed. By whose definition? An administrative regulatory agency. By whose guidelines? By whose authority? On what grounds? Only that of an administrator—not the Legislature.

The motion to reconsider is overruled.

*Motion overruled.*